## No. 7671.

### INTERDICTION OF JOSEPH DUMAS.

By voluntary absence of two years, a resident of this State forfeits both his civil and political domicile in it.

A suit for interdiction must be brought at the *actual* domicile, the *domicilium habitationis*, of the Defendant, not at his merely legal or constructive domicile.

A Court of this State cannot issue its process in a personal action, on a person actually residing beyond its territorial limits and within those of a different sovereignty.

Service of citation issued by a Court of this State, cannot be made in a foreign country by the American Consul.

APPEAL from the Second District Court, parish of Orleans. *Tissot,* J.

J. L. Tissot for Plaintiffs and Appellees :

Dumas has always had his domicile in the City of New Orleans, where he was born and married, though his residence has been temporarily in France. It is only the political, not the civil domicile, which is forfeited by an absence of two years. Dumas never acquired a domicile in France. Even if he had forfeited his domicile here, still the suit must be brought before the Court of his last domicile.

Every interdiction must be pronounced by the judge of the domicile of the person to be interdicted. C. C. 392 ; Nap. C. 492 ; C. P. 162, 924.

The personal statute follows the party into a foreign country. Fœlix, Droit Internat. Privé, vol. 1. Demolombe, vol. 1, Nos. 98 and 99. Wheaton, Internat. Law, p. 172.

Personal service of Citation was made on Dumas by the American Consul in Paris. Intervenors cannot urge defenses personal to Defendant. 21 An. 118 ; 13 An. 222 ; 8 Rob. 123 ; 8 M. 55.

C. E. Schmidt and Armand Pilié for Intervenors and Appellants :

It is the duty and the right of Intervenors, as presumptive heirs of Defendant, to intervene. C. C. 390 ; C. P. 389.

Dumas had clearly no domicile in this State. C. C. 46 ; 29 An. 253. Dr. Wharton, Law of Domicile, p. 6 and 8 ; Story, Conflict of Laws, § 46 and § 47 ; 14 How. 423 ; 16 Wall. 73.

He might have had a *domicile* in France though he had taken no steps, under the French law, to become a French *citizen.* Laurent, vol. 2, pp. 94 and 95.

If he were one of the class of persons who belong to no country, *ex necessitate* the French Courts, of the place of his *actual* residence, would have acted upon the demand for his interdiction. Laurent, vol. 1, § 369.

The Second District Court could have no jurisdiction, the law requiring that the Defendant should reside or be domiciled in the place where he is sought to be interdicted. C. C. 392, 393, 425. No such suit can be brought where he resides out of the territorial jurisdiction of the Court.

No constructive citation can be made in a suit for interdiction. The law contemplates that the domicile at which the defendant may be sued shall not be a mere *domicilium originis*, but an actual domicile, *domicilium habitationis.*

The Second District Court could not issue process beyond its territorial jurisdiction. Story, Conflict of Laws, § 539.

United States Consuls have no authority to serve citations.

---

The opinion of the Court on the Merits and on Rehearing was delivered by

BERMUDEZ, C. J. The correctness of the judgment rendered by the Court *a qua*, interdicting Joseph Dumas, is questioned in this Court, and its reversal, with a dismissal of the suit, is urged on the following grounds :

1st. That the Second District Court had no jurisdiction of the domicile, or person of the defendant ;

2d. That if it had, Dumas was not legally cited to appear before that tribunal.

The suit was brought by *four* of the children of Dumas, under proper averments of mental debility and complete inability on his part to take charge of his person and property. The petition alleges distinctly that, although Dumas be in Paris, France, at the time, his domicile is in New Orleans, the place of his nativity and marriage, and that he is a citizen of the United States and of Louisiana.

Under that representation of facts, the Court assumed jurisdiction, citation issued, and was served in Paris personally on Dumas. Some two months and a half after notice of the suit had been thus signified to Dumas, it being shown that he made no appearance in person, by counsel, or otherwise, the Court appointed a curator *ad hoc* to represent him in the proceedings.

The remaining *two* children of Dumas intervened in the suit, resisting the demand for his interdiction. Exceptions were filed to their intervention, but they were not urged, and were not passed upon by the lower court. The case was decided on its merits. No motion to dismiss the appeal was made in this Court. The exceptions must be considered as abandoned—the more so as there was no judgment in the lower court overruling them, and no amendment was, and could be, asked here in the absence of any judgment touching them which we could be called upon to review. Their legal status does not appear to be at all questioned here. We deem, however, that the children who have thus intervened had a right to make the appearance they did, for the reasons, that the case was one of public order; one in which the liberty and property of their father were involved; one in which questions of great importance to the family were to be agitated and determined, and in which they were justified in feeling a deep and important, though remote interest, as presumptive heirs. They surely could have brought the suit; they could have joined the petitioners; why should they not be permitted to resist an application of such magnitude, which, if granted, might work irreparable injury, as the judgment could not be suspended by appeal? R. C. C. 395.

The case having been put at issue, was tried and judgment was rendered incapacitating Dumas.

I. In order to ascertain whether the lower court had jurisdiction over the matter presented, it is necessary to inquire whether Dumas was at the time of the institution of the suit domiciled within the territorial limits of that tribunal.

Article 392, R. C. C., provides that " every interdiction shall be pronounced by the judge of the *domicile* or *residence* of the person to be interdicted."

It is in proof that Dumas first, *voluntarily*, left New Orleans in 1847, with his family, and moved to Paris, France, where he established himself and lived up to 1862 or 1863, when he returned to New Orleans, sojourning there until 1865, when he again *voluntarily* left for Paris. He continued to reside in that city afterward up to 1879, when the interdiction proceedings were commenced here, and did not cease to live there subsequently.

Article 46 of the R. C. C., which is a re-enactment of act of 1855, p. 331, provides that a *voluntary* absence of *two years* from the State, or the acquisition of residence in any other State of the Union, or *elsewhere*, shall *forfeit* a *domicile* in the State.

We are fully satisfied from the evidence that Joseph Dumas was, from the beginning, unwilling to continue to have his domicile in New Orleans ; that he *intended* to go and establish himself abroad, and that in point of fact he did do so, most unequivocally, without entertaining the remotest determined idea of returning to Louisiana. His absence was *voluntary*, for quite a number of years. The conclusion is irresistible, that he forfeited his domicile here, even if he acquired none in France ; and that the lower court had no jurisdiction over him, and, therefore, over the suit brought to interdict him.

See State vs. Poydras, 9 A. 167 ; Blake vs. Nelson, 29 A. 253 ; Evans vs. Payne, 30 A. 498, 502.

II.    Assuming, however, that he had not lost his domicile here, and that his residence in Paris was only *temporary*, the question arises, could the Second District Court extend its jurisdiction over him, while he was in Paris, for the purpose of the interdiction suit brought here ? As a rule, courts have no right to issue their process beyond their limited judicial sphere of action, but there are cases in which they may do so within the boundaries of their sovereignty, within which they are established, and the *exceptions* are well defined.  9 R. 348 ; 8 N. S.; 11 L. 129 ; C. P. 129, and other articles.

It seems to us that when the law requires that " every interdiction shall be pronounced by the competent judge of the *domicile* or *residence* of the person to be interdicted," it contemplates that such *domicile* or *residence* should be, *as a rule*, the place of abode of such person, the *locus habitationis*, the place where the *body* can be found and reached, within the territorial limits of the court itself, and, *as an exception*, the place of the *bona fide* abode, intentional or accidental, of such person within the national boundaries of the sovereignty which the court represents.

The reason of this is obvious, and it is this, that a personal view and inspection of the person whose insanity is alleged is not only

proper, but eminently necessary, when practicable, in order that upon the testimony of the witnesses, the report of the medical experts or other suitable evidence, the interrogation of the party, the judge may, at the very moment of the rendition of the judgment, have it in his power to *see* and decide *for himself* whether his decree will or not bear upon a person *compos vel non*. R. C. C. 417, 423–425. In fact, it is made the duty of the judge, even after interdiction, to visit him whenever he shall deem it expedient. The court is required to appoint a superintendent, who is to have free access to the party, in order to inform the judge frequently of the state of health of the person interdicted, and of the manner in which he is treated. R. C. C. 424. The person interdicted is not permitted to be taken out of the State without a judicial order granted on the advice of a family meeting, and the sworn opinion of two physicians that they believe the departure necessary to the health of the party. R. C. C. 423.

If a court, having jurisdiction *ratione materiæ*, sitting in New Orleans, has the power of sending its process, in an action essentially personal, beyond its territorial boundaries to be served on a party living within the limits of the *imperium* of a sovereignty altogether distinct and independent, as in the present instance, in Paris, France, it could on the same principle exercise a similar prerogative touching a person established in China, or Patagonia, or any other like country.

"No sovereignty, says Judge Story in his Conflict of Laws § 539, can extend its process beyond its territorial limits to subject either person or property to its judicial decisions. Every exertion of authority of this sort beyond this limit is mere nullity, and incapable of binding such persons or their property in any other tribunal."

See, also, Allard: Chose Jugée, 331.

Fœlix, Droit International Privé, t. 11. 39.

Merlin 2 D. vo. Jugement, § 14, No. 1, 3d ed., vol. IV., p. 20.

Rorer on Inter. State Law, p. 10, 167, 168, and notes.

Courts should never assume to render judgments which, in any given instance, it would be impossible for them to have executed by their own officers, or officers under their control, or officers of a distinct nationality, by comity. How, in the present instance, could the Second District Court have its judgment enforced in Paris? Assuming that it had jurisdiction over the case, that it could have cited the defendant there, as was done, its judgment, until then dormant only, could not be carried out in France, without being first subjected to revision, and even then without confirmation by vivification, by the constituted judicial local authorities. In the event of any refusal on their part to co-operate, in the absence of any comity between the two countries, the Second District Court would be powerless to have its judgment enforced

in France, whether to have Dumas confined in a sanitary institution, or placed under the control of some designated person, or to have his property there, even if movable, administered upon by a curator, appointed and qualified here.

It appears that the attempt was made to have Dumas interdicted by the competent tribunal in Paris, but that *ex officio* it declined jurisdiction, *ratione personarum*, the parties being foreigners, the Court being aware, however, of the institution of the interdiction proceedings in New Orleans.

We understand that the correctness of that ruling is assailed, and that the case is pending before the Court of Appeals in Paris. However singular it may appear *to us*, whether it shall be reversed or confirmed there, is a question with which we do not propose to deal, as we are not called upon, and have no authority to review it. Had a judgment been rendered there interdicting Dumas, and were a proceeding pending before us for the execution of such judgment here, we would then have an opinion to express.

If the ruling of the French court and our own views be correct, however different or contrary they may appear, it would result that Dumas, although unquestionably insane, would be interdicted neither by the court having jurisdiction of his *person* nor by that having jurisdiction of his admitted *last domicile*, and of his property.

If the case before the court be one for which no legal provision was made, the fault, if there be any, is not with the judiciary, who can expound the laws only as they find them, whatever consequent embarrassment may follow. But there is no deficiency or *hiatus* in the protection which the law should afford to those who look to it for security in their person or property. It does not necessarily follow that the creditors, or the presumptive heirs of Dumas, or any one concerned in him, or in his estate, would suffer any injury from that anomalous condition of things. Before Dumas went to Paris he had left a power of attorney, by which he conferred unlimited rights of administration and alienation on a person in whom he had placed his confidence, and the authority thus delegated, was afterward transferred to one who has appeared as a resisting intervenor in these very proceedings.

The lamentable disability with which, it is alleged that Dumas was afflicted at the bringing of this suit, and which continued to dement him long afterward, was a mental malady, which could,—no more than any other infirmity,—produce the effect of revoking the procuration which he had given to his agent. It could be recalled, in a circumstance like this only by an actual, valid, judgment of interdiction. R. C. C. 3027. The institution of the interdiction suit did not revoke the powers so entrusted. Gernon vs. Dubois, 23 An. 27.

Even could such mental derangement put an end to the mandate, the consequence would only have been that Dumas would have had to be treated as an *absentee*, and his property taken care of and administered upon as provided by law in such cases. R. C. C. art. 50 *et seq.*

III. Although the foregoing considerations would suffice to justify our decree, we deem it advisable, in view of the novel nature of this important case, and of the character of the proceedings required in such matters, to proceed further, and to consider, somewhat briefly, the second point presented for our determination.

Conceding, *arguendo*, that the court could send its process beyond its territorial boundaries, to be served on a person within the limits of another distinct sovereignty, the question arises : Should not that process, to such person, there, be the same as the law would require it to be, did that person reside within the undisputed jurisdiction of the court?

It is an unassailable proposition of law that no judgment intended to affect a person in his rights of *self-control*, or of administration and disposal of his property, can be validly rendered, unless, as a condition precedent, such person has actually, by the process of the proper court, before which the demand is pending, been cited, as a defendant, in strict legal form, by service on him, either personally, or at his domicile, or by the seizure of his property.

The law has provided certain forms in which such person can be compelled, at his risk, to notice judicial proceedings against him. Unless these forms be fully observed, particularly those which serve as a foundation for the suit, *such as a citation*, the defendant can assume to ignore the steps taken against him, and the plaintiff may proceed, but at his peril, in the prosecution of his suit.

It is settled, beyond the possibility of a doubt, that it is indispensably necessary, in an interdiction proceeding, that the person sought to be declared incapacitated be cited, and that the citation should be served on him *personally*, if practicable, for such mode of conveying notice is eminently preferable, and that if such service be not made, it shall take place as otherwise indicated by law. 16 L. 63 ; 1 N. S. 551 ; 23 A. 26.

The citation in this instance is addressed to Joseph Dumas, without mentioning the place of his residence. It allows him ten days from service to answer, and does not appear to bear the seal of the court by whose authority it issued. The petition states that Joseph Dumas resides *in Paris*. Why was not the citation directed to him there ? Why did it not mention the additional delay granted by law to parties residing at a greater distance than ten miles from the place where the court holds its sitting ? Why was not the seal of the court impressed upon the citation, to fully authenticate it ? This important summons has issued in plain

disregard of the requirements of law. C. P. 179, §2, §5, §7; 19 L. 68. The answer, that the defendant was *absent* from the State, and that citations addressed to absent persons, who may be amenable by the powers of the court, are not required to be made in compliance with those provisions of the Code of Practice, would, if true, obliterate, in *personal actions*, these wise formalities, and leave the form of the original process to be issued in such cases at the whim and caprice of courts of justice. It is a proposition so evidently self-destructive that we cannot for a moment entertain it. The ruling in 4 L. 220, invoked by the appellees, is entitled to no application, as it was made in an *attachment* case, in which the proceeding is not *in personam*, but *in rem*, and where the place of residence of the defendant is not required to be known and stated. A suit instituted, for the interdiction of a disabled person, is essentially a proceeding *in personam*, as one of its objects is the deprivation of the right of *self-control*.

IV. Besides: the service of that informal and illegal citation was made by the U. S. Consul in Paris, on the defendant. We know of no law, Federal or State, which vests national representatives with the power of serving judicial process of State courts on parties within their sphere of representative action. We have, nevertheless, requested counsel to inform us on the subject, but they have failed to do so. It cannot be conceived that the General Government sends representatives abroad for the purpose of acting as the executive officers of the different State courts in the Union. It is true that those representatives sometimes act as the ministerial officers of such courts, as, for instance, to execute commissions to procure testimony, and the like; but they do so with the special authority of State legislation, providing distinctly for such cases. The inference, therefore, is, that, even if the citation could have issued and was valid, the service of it did not take place by the instrumentality of one authorized by law to make it.

Finding as we do, that Joseph Dumas had lost his domicile in New Orleans by a *voluntary* continued absence from it during some fourteen years, previous to the bringing of this suit,—that the court could not issue its process to one actually residing not only beyond its territorial limits, but in a different, independent sovereignty,—that the citation issued to the defendant is informal, and that the service of it was made by an unauthorized officer,—we conclude that the plaintiffs have brought and carried on these proceedings and obtained the judgment assailed here, subject to befalling contingencies.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be and the same is hereby avoided, annulled, and re-

-versed ; and it is now ordered that this suit be and the same is hereby
dismissed, at the costs of the petitioners in both courts.

## On Petition for Rehearing.

We have given full consideration to the application for a rehearing,
reviewing the original briefs, our own opinion, considering the points in
support of the petition, and *even* the judgment of the Court of Appeals
of Paris, filed with the petition, dealing with it, however, merely as with
an argument, and in no way as evidence, for it is *foreign* to the record.

We remain satisfied that the Second District Court had no jurisdic-
tion of the person of Dumas, who had forfeited his domicile here by a
voluntary absence and residence in France of *seven times two years*, and
that the process of the Court was irregularly issued and served.

It is evident, from the reading of the judgment of the tribunal of
first instance, in Paris, refusing *ex officio* to take cognizance of the merits
of the suit for interdiction, that it abstained from passing on the case,
not so much because Dumas was a foreigner, but chiefly because a suit
for his interdiction was pending before a court in his country. It is
likewise clear, from a perusal of the judgment of the Court of Appeals
of Paris, which seems to have been rendered by default, that the find-
ing of the lower court was ordered to have force, effect, and execution
for the same reasons, the appellate court assuming knowledge of the
judgment of interdiction rendered by the District Court in New Orleans,
and presuming its competency in the matter, and fulfillment of all legal
exigencies required as conditions precedent for the validity of such pro-
ceedings.

It may be plausibly surmised that had not the fact of the pendency
of the interdiction suit here been made known to the French court, they
would not have abstained from passing on the merits of the petition for
interdiction before them, and that in acting with the delicacy which
always characterizes them in such matters, they were inspired with a
due appreciation of the comity of nations between tribunals entrusted
with the administration of justice within their respective sovereignties.
Laurent, vol. 2, pp. 94, 95.

It is a matter of perfect indifference for the determination of this
case, whether after forfeiting his domicile in Louisiana, Dumas acquired
a domicile elsewhere. He might, as a bare possibility, have been during
those fourteen years roaming through the world. That circumstance
would not suspend the operation of the law of the State relative to the
forfeiture of *both* his *civil* and *political* domicile within its boundaries.
Dumas, by not electing a domicile, *permis de séjour*, in France, where

he was sojourning as a gentleman of leisure and fortune, in the enjoyment of entertainments and pleasures not to be found in the mother country, had not the less forfeited his civil domicile in this State. By such voluntary commission and omission he belonged to that numerous class of persons upon whom prosperity has smiled or adversity frowned, who leave their native land going from one place to another, having no country, *sans patrie*, and therefore no domicile. Laurent, vol. 1, § 369.

In the case of the State vs. Widow and Heirs of Poydras, 9 A. 167, in which the State recovered from the children of Poydras, in the shape of a ten per cent tax on inheritances accruing to heirs residing abroad the sum of fifty thousand dollars, the court expressly held : that, "*even if he (Poydras) acquired no domicile in France, he had forfeited his residence in Louisiana by a voluntary absence from this State of two years,*" and that "*if the father had lost his residence, his children born abroad * * * cannot be held to be residents of this State or domiciliated therein.*"

We have not been shaken in our convictions by the considerations again submitted to us on the petition for a rehearing.

It is therefore ordered that said petition be refused, and that our previous judgment remain undisturbed.